**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| DANIEL K. CROFT, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )     **CAUSE NO. 1:15-cv-00254-SLC** |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, *sued as Carolyn W. Colvin,* | ) |
| *Acting Commissioner of SSA,* | ) |
| | ) |
|     Defendant. | ) |

## OPINION AND ORDER

Plaintiff Daniel K. Croft appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[1]  (DE 1).  For the following reasons, the Commissioner's decision will be

AFFIRMED.

## I.  PROCEDURAL HISTORY

Croft applied for DIB and SSI in August 2012, alleging disability as of July 25, 2012.

(DE 9 Administrative Record ("AR") 139-46).  The Commissioner denied Croft's application

initially and upon reconsideration.  (AR 79-95).  After a timely request, a hearing was held on

December 18, 2013, before Administrative Law Judge Patricia Melvin ("the ALJ"), at which

Croft, who was represented by counsel; his mother; and a vocational expert, Robert Barkhaus,

Ph.D. (the "VE"), testified.  (AR 36-74).  On April 10, 2014, the ALJ rendered an unfavorable

---

[1] All parties have consented to the Magistrate Judge.  (DE 12); *see* 28 U.S.C. § 636(c).

decision to Croft, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of unskilled, light jobs in the economy. (AR 20-29).  The Appeals Council denied Croft's request for review (AR 1-16, 260-88), at which point the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

Croft filed a complaint with this Court on September 11, 2015, seeking relief from the Commissioner's final decision.  (DE 1).  Croft advances just one argument in this appeal—that the ALJ improperly discounted the credibility of his symptom testimony concerning his physical limitations.  (DE 20 at 9-12).

## II.  FACTUAL BACKGROUND[2]

At the time of the ALJ's decision, Croft was 52 years old (AR 29, 139); had a ninth grade education (AR 180, 291); and possessed past work experience as a cable installer for satellite television, a maintenance worker, a materials handler, and a tow truck driver (AR 249).  Croft stopped working in July 2012.  (DE 179).  He alleges disability due to lumbar spinal stenosis, lumbar spinal degenerative joint disease, lumbar spinal degenerative disc disease, trochanter bursitis, and post decompressive lumbar laminectomy and lumbar fusion.  (DE 20 at 2).

### A.  *Croft's Testimony at the Hearing*

At the hearing, Croft, who was five feet, 10 inches tall and weighed 185 pounds, testified that he was divorced and had custody of his 12-year-old son.  (AR 40).  Croft was receiving food stamps and Medicaid benefits.  (AR 41).  When asked why he thought he could not work, Croft cited his right leg sciatica and constant lower back pain.  (AR 47).  He explained that his

[2] In the interest of brevity, this Opinion recounts only the portions of the 480-page administrative record necessary to the decision.

symptoms had started 20 years earlier, had worsened as he got older, and had in the previous year started to interfere with his ability to work. (AR 47). Croft testified that he had put off having back surgery for a long time, stating that his insurance would not cover a major surgery, he was fearful the surgery may not help, and he could not take a year off of work and still care for his son. (AR 58-59). However, just two months prior to the hearing, Croft underwent back surgery; he acknowledged that the surgery helped to reduce his back pain and sciatica. (AR 48, 50). Croft stated that his doctor anticipated that he would continue to experience further improvement as well. (AR 48, 50).

Croft described his back pain on a 10-point scale as a "three" or "four" before surgery and a "two" since surgery. (AR 48). His pain worsens if he stands or walks too long, causing him to sit to relieve his symptoms; however, he stated that extended sitting bothers him as well. (AR 48, 50). Lying down and alternating between sitting and activity help to reduce his pain. (AR 50). Croft stated that he tried steroid injections and physical therapy prior to surgery, but they were unhelpful. (AR 49). Croft testified that he was taking medications for pain (Norco) and muscle spasms and that these medications had been helpful since surgery, but not before. (AR 49). He experienced no side effects from his medications, aside from constipation. (AR 49).

Croft stated that he could stand for 20 minutes at a time since surgery and "hardly at all" before surgery. (AR 52). He estimated that he could sit for about an hour, but then has to move around. (AR 52). He was on a post-surgical three-pound lifting restriction at the time, but he could lift 10 pounds without pain prior to surgery. (AR 53). He has no problems pushing or pulling, climbing stairs, balancing, and fingering, but overhead reaching bothers him "a little

bit." (AR 53-54). He has some difficulty sleeping and wakes often throughout the night, but his sleep has improved since surgery; he lies down or sleeps one to two hours during the day. (AR 60-62). He performs his own self care, although since surgery his son has helped him to put his legs into his pants. (AR 54). He performs almost all of the household tasks (including doing dishes, cooking, laundry, making beds, vacuuming, cleaning the bathroom), but he sits down intermittently during tasks; he also cares for his son on a daily basis. (AR 52-53, 55-57, 62). Croft drives a car and shops for groceries, but his son takes out the garbage and does the yard work.[3] (AR 54-56).

*B. Summary of the Relevant Medical Evidence*

In March 2008, Croft visited Michael Arata, M.D., an orthopedic surgeon, concerning a 20-year history of low back discomfort that sometimes affected his legs and worsened with sitting, standing, or walking. (AR 342-43). He was working at Wayne Metal at the time. (AR 342). Physical exam findings were normal. (AR 342). X-rays showed some diffuse, fairly mild degenerative changes of the lumbar spine and mild retrolisthesis at L4-5. (AR 343). An MRI showed mild to moderate spinal stenosis at L3-4 and desiccated disks at L3-4 and L4-5, possibly L5 and S1. (AR 343). Dr. Arata diagnosed discogenic low back pain with associated mild to moderate L3-4 stenosis. (AR 343).

In November 2008, Croft saw David Ringel, D.O., for his low back pain. (AR 306). He reported that he had received three spinal injections, but that only one had helped. (AR 306).

---

[3] Croft's mother also testified at the hearing, stating that she has seen a dramatic deterioration in Croft's back condition in the last five or six years. (AR 64). She stated that he has a very high pain threshold and downplays his pain. (AR 64-67). She has seen him walk with a limp, and he has used a cane at times. (AR 65). Sometimes she helps him with his housework. (AR 66-67). She has also noticed that he used to be a more "upbeat" person, but now seems to be more "down" due to his pain. (AR 66).

Although Croft stated that his back pain had worsened, he was still working at the time and was not interested in undergoing surgery.  (AR 306).

In December 2008 and January 2009, Croft consulted Steven Hatch, M.D., a pain management specialist, for his low back pain.  (AR 344-48).  Dr. Hatch prescribed Vicodin and recommended that Croft receive additional spinal injections.  (AR 348).

Almost two years later, in December 2010, Croft returned to Dr. Ringel with complaints of back pain.  (AR 305).  He had started a new job and needed pain medication.  (AR 305).  On physical exam, Croft had bilateral lumbar back spasm, right lumbar pain, and right sciatic pain.  (AR 305).  Dr. Ringel prescribed Norco and Soma.  (AR 305).

In June 2011, Croft saw Dr. Ringel, reporting that Norco and Soma did help but that he still experienced some sharp pain.  (AR 303).  Croft did not want to undergo a surgical fusion.  (AR 303).  On physical exam, he had a back spasm bilaterally at T-4, pain at the right SI joint, and right sciatic pain; he could flex to 60 degrees, bend 20 degrees to the side, and walk on his toes.  (AR 303).  Dr. Ringel added Nubain to his medications.  (AR 303).

One year later, in June 2012, Croft returned to Dr. Ringel, reporting that there was no change in his back pain.  (AR 299).  Dr. Ringel noted bilateral lumbar spasm and severe pain in the right sciatic notch.  (AR 299).

In October 2012, Croft underwent a physical examination by H.M. Bacchus, Jr., M.D., at the request of Social Security.  (AR 325-27).  Croft stated that he had stopped working a few months earlier—on or about July 2012.  (AR 325).  Dr. Bacchus noted tenderness to palpitation and range of motion throughout the lumbrosacral spine and also pain in the right sciatic notch.  (AR 326).  A straight leg raising test was positive on the right but negative on the left.  (AR

326).  His gait was antalgic and favored his right lower leg, but was steady with fair

sustainability.  (AR 326).  His tandem walk was slightly clumsy, and he had a poor hop, worse

on the right that on the left; he could squat one-third of the way down.  (AR 326).  His muscle

strength was normal, except that his right lower leg was 4/5.  (AR 326).  X-rays showed bone

spurs at L3-4 and L5; decreased intervertebral disc space at L3-4, severe at L4-5, and almost a

total loss at L5-S1; and bone bridging between L3-4 and L4-5, with the left worse than the right.

(AR 326).  In sum, X-rays showed degenerative joint disease (mild at L1, L2, left sacroiliac

joint, and right hip;  moderate at L3; and moderate to severe at L4 and L5) and degenerative disc

disease (mild at L3-4 and moderately severe at L4-5 and L5-S1).  (AR 326).  Dr. Bacchus's

impression was chronic low back pain with right sciatica, degenerative joint disease,

degenerative disc disease, knee pain, depression (treated with medication), hypertension (treated

with medication), hyperlipidemia (treated with medication), and long-term tobacco abuse (needs

smoking cessation).  (AR 327). Dr. Bacchus concluded that while Croft had chronic and severe

pain in his lower back, he retained the functional capacity "to perform at least light duties with

limitations in regards to repetitive bending, twisting, turning, climbing, squatting and walking on

uneven ground."  (AR 327).

     In October 2012, J.V. Corcoran, a state agency physician, reviewed Croft's record and

concluded that he could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six

hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally balance,

stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or

scaffolds; and must avoid concentrated exposure to hazards (such as slippery uneven surfaces

and unprotected heights) and wetness.  (AR 330-33).  Dr. Corcoran's opinion was affirmed by

Robert Bond, M.D., another state agency physician, in November 2012. (AR 337).

In February 2013, Croft saw Dr. Ringel for a followup on his back pain. (AR 417). Inspection and palpation of the lumbar spine was within normal limits, but there was some tenderness and spasm of the lumbar spine. (AR 418). Range of motion and muscle strength were within normal limits. (AR 418). Testing for nerve root disease was negative. (AR 418).

Seven months later, in September 2013, Croft visited Bryan Kaplansky, M.D., for worsening low back pain. (AR 357). Croft's pain was centered in his low back, but it was changing sides; his pain was waking him at night. (AR 357). He had constant right lower leg symptoms of tingling and pain, but no numbness or weakness. (AR 357). His pain was aggravated by engaging in any activity too long, such as leaning forward and driving. (AR 357). As to his medications, Norco and Soma help him the most by "tak[ing] the edge off"; other medications did not work for him. (AR 357). He had tried Morphine, but he "felt like a zombie" when taking it, and Soma made him "too sleepy." (AR 357). He wanted to avoid surgery. (AR 357). On physical exam, Croft's gait and strength were normal; he was able to walk on heels and toes bilaterally. (AR 357). A straight leg raising test was positive on the right seated with knee extension and supine past 40-45 degrees; a crossed straight leg raising test was negative. (AR 357). Lumbar motion recreated his low back pain radiating into his right leg posteriorly with flexion; extension relieved the pain. (AR 357). An X-ray of his lumbar spine showed mild dextroscoliosis, mild retrolisthesis of L4 and L5, anterolisthesis of L3 and L4, multi-level degenerative disc disease and degenerative facet joints, and no definitive acute bone abnormality. (AR 359). An MRI of his lumbar spine showed multi-level degenerative bulging/protruding discs accompanied by facet hypertrophy resulting in central canal, foraminal,

lateral recess compromises referenced by the disc level without significant interval progression from the previous MRI.  (AR 367).

On October 1, 2013, Croft saw James Dozier, M.D., a neurosurgeon, for his back and right leg pain.  (AR 400-01).  On physical exam, Croft had marked tenderness behind his right thigh.  (AR 401).  Dr. Dozier reviewed the previous MRI and noted that Croft had multi-level changes of lumbar spondylosis and foraminal changes, including foraminal changes at right L3-4, L4-5, and L5-S1.  (AR 401).  A week later, Croft returned to Dr. Dozier.  (AR 392).  An MRI of Croft's right thigh showed evidence of trochanteric bursitis.  (AR 392).  Dr. Dozier observed that Croft had fairly significant facet changes, and they discussed's Croft's options, including undergoing a foraminotomy and a fusion.  (AR 392).  Later in October 2013, Croft underwent an L3-L5 decompressive laminectomy and fusion with instrumentation performed by Dr. Dozier.  (AR 379).

At a visit to Dr. Dozier one month after surgery, Croft was no longer having the radiating leg pain that he had preoperatively, and his leg strength was normal.  (AR 376).  He was still having some other pain and had run out of his pain medication.  (AR 379).  Dr. Dozier referred Croft to physical therapy, noting that he likely had a component of trochanter bursitis and may need injections.  (AR 376).  From December 2013 through February 2014, Dr. Dozier noted that Croft was neurologically stable and without leg pain, but that he still had some back discomfort.  (AR 423, 468, 472).  Dr. Dozier instructed him to continue physical therapy, including work conditioning.  (AR 471).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On April 10, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 20-29). At step one of the five-step analysis, the ALJ found that Croft had not engaged in substantial gainful activity since his alleged onset date. (AR 22). At step two, the ALJ found that Croft's degenerative disc disease and degenerative joint disease

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

of the lumbar spine were severe impairments. (AR 22). At step three, the ALJ concluded that

Croft did not have an impairment or combination of impairments severe enough to meet or equal

a listing. (AR 23). Before proceeding to step four, the ALJ determined that Croft's symptom

testimony was not entirely credible, and the ALJ assigned him the following RFC:

> [T]he claimant has the [RFC] to perform light work . . . except he can lift/carry 20
> pounds occasionally and 10 pounds frequently; can stand/walk 6 hours out of an
> 8-hour workday; can sit 6 hours out of an 8-hour workday; can never climb
> ladders, ropes, and scaffolds; can occasionally climb ramps and stairs; can
> occasionally balance, stoop, kneel, crouch and crawl; and must avoid frequent
> exposure to wetness, slippery/uneven surfaces, and work at unprotected heights.

(AR 24).

At step four, the ALJ found that Croft was unable to perform any of his past relevant

work. (AR 27). Based on the RFC and the VE's testimony, the ALJ concluded at step five that

Croft could perform a significant number of unskilled, light jobs in the economy, including

electrical accessories assembler, small products assembler, and cashier. (AR 28). Therefore,

Croft's applications for DIB and SSI were denied. (AR 29).

## C.  The ALJ's Credibility Determination Will Not Be Disturbed

In his sole argument on appeal, Croft argues that the ALJ improperly discounted the

credibility of his symptom testimony concerning his physical limitations. Specifically, he asserts

that if the ALJ had credited his testimony that he could stand for only 20 minutes and lift just

three pounds post-surgically, he would be limited to sedentary work, and as such, would be

disabled under Grid Rule 201.09. For the following reasons, Croft's arguments are

unpersuasive.

An ALJ's credibility determination is entitled to special deference because the ALJ is in

the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th

Cir. 2000).  If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").  "[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong."  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) (citations omitted).

The ALJ found Croft's testimony of disabling limitations "not entirely credible," stating:

> It is not unreasonable to think that the claimant's condition just before his October 29, 2013, surgery, and for some time after, precluded work-related activities.  There is, though, no medical evidence showing that the period of an inability to work either prior to and/or after surgery was 12 months long as Social Security disability regulations require.

(AR 25).  The ALJ discounted the credibility of Croft's symptom testimony based on several factors.

First, the ALJ considered the objective medical evidence, or the lack thereof, supporting a period of disability for 12 months continuous in duration.  "Objective medical evidence . . . is a useful indicator to assist [the Commissioner] in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms, such as pain, may have on [the claimant's] ability to work."  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

"The discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating [his] condition." *Powers*, 207 F.3d at 435-36.

Here, the ALJ observed: "There is almost no medical evidence relevant to the claimant's spinal impairments from the alleged onset date in July 2012 until a little more than one month before surgery in October 2013" (AR 25), and "there is *no* relevant medical evidence from February 2013 until September 9, 2013" (AR 26 (emphasis added)). To illustrate these points, the ALJ noted that Croft simply had received medication refills in December 2012, January 2013, and March 2013; and that at a visit to Dr. Ringel in February 2013, Croft's examination results were unremarkable, other than tenderness and spasm of the lumbar spine.[5] (AR 25 (citing AR 417-18)).

The ALJ acknowledged, however, that Croft did see Dr. Kaplansky in September 2013 for worsening symptoms, and that he underwent surgery by Dr. Dozier one month later. (AR 25-26). The ALJ observed—and properly so—that the surgery alleviated Croft's symptoms to a significant degree, as Dr. Dozier wrote in November 2013 that Croft no longer had radiating leg pain and that his lower extremity strength was normal. (AR 26 (citing AR 376)). Likewise, Dr. Dozier wrote in December 2013 and January 2014 that while Croft had "some back discomfort" and continued to need pain medication, he was "neurologically stable" and pain-free in his right leg. (AR 26 (citing AR 423, 468)).

The ALJ also considered that Croft complained to Dr. Dozier in February 2014 of pain if

---

[5] In fact, Croft told Dr. Ringel in June 2012 (just prior to his alleged onset date) that there had been no change in his back pain from his visit one year earlier in June 2011 when he was still working. (AR 299).

he stood or walked more than 15 minutes and of difficulty standing up after sitting for 30 minutes, and that Dr. Dozier referred Croft to physical therapy, including work conditioning. (AR 26 (citing AR 468, 471-72)). The ALJ found it significant that despite Croft's complaints, "[t]here is no report or opinion by a physician or by the physical therapist that suggests the claimant's current limitations will last at least 12 months or, indeed, that he will not be able to very significantly increase his strength and his range of motion, and decrease his pain." (AR 27 (citing AR 464-65)). The ALJ concluded that while Croft's symptoms may have been disabling from September 2013 until some point after his October 2013 surgery, the record does not evidence that his symptoms were of a disabling severity for a continuous period of 12 months as required by the Act. (AR 27).

Croft takes issue with the ALJ's consideration of the objective medical evidence when assessing his credibility. Specifically, Croft claims that while the ALJ stated that his last MRI indicated no significant interval progression, the ALJ did not explicitly acknowledge Dr. Dozier's comment that he had "facet changes which looked fairly significant." (DE 20 at 12 (citing AR 392)). From there, Croft argues that the ALJ "failed to explain why she went with the opinion of the radiologist and not that of Dr. Dozier." (DE 20 at 12 (citing AR 392)).

First, an ALJ "need not address every piece of evidence in [her] decision." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (citation omitted). Rather, the ALJ "must only minimally articulate . . . her justification for rejecting or accepting specific evidence of disability," which has been described as a "lax standard." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (citation omitted). Here, the ALJ considered Dr. Dozier's concern about the "multilevel changes of lumbar spondylosis and foraminal changes" in Croft's September 2013

MRI and his recommendation that Croft undergo surgery. (AR 26 (citing AR 392)). Ultimately, the ALJ found that Croft's symptoms improved after surgery. As such, Dr. Dozier's pre-surgical observation that the MRI showed fairly significant facet changes does not rise to "an entire line of evidence that is contrary to the [ALJ's] ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citations omitted) ("Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling.").

Furthermore, the ALJ relied primarily on the opinions of Dr. Bacchus and Dr. Corcoran (as affirmed by Dr. Bond), *not* the opinion of the radiologist. (AR 27). Consistent with the RFC assigned by the ALJ, Drs. Bacchus and Corcoran concluded that Croft could perform light work with additional postural and environmental hazard limitations. (AR 27 (citing AR 325-27, 329-37)). And as to Dr. Dozier, he did not opine about any long-term functional limitations, as he simply limited Croft after surgery to "activity as tolerated and no driving for today." (AR 256-58, 372). "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."[6] *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. §§ 404.1512(c)); *see*

---

[6] In his reply brief, Croft for the first time argues that the ALJ should not have relied on the opinions of Drs. Bacchus and Corcoran (as affirmed by Dr. Bond) because their opinions predated his September 2013 MRI and his October 2013 surgery. (DE 30 at 3). He suggests that the ALJ should have consulted another medical expert to consider this evidence. However, "arguments raised for the first time in a reply brief are deemed waived." *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) (citations omitted); *see Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."); *Anderson v. Astrue*, No. 1:09-CV-00327, 2010 WL 3522574, at *9 n.7 (N.D. Ind. Aug. 31, 2010) (collecting cases).

And even if Croft had not waived this argument, it is unpersuasive. Croft admitted at the hearing that his back symptoms improved after surgery and that Dr. Dozier anticipated that he would continue to experience improvement. (AR 48). As observed above, Dr. Dozier did not opine that Croft had any long-term functional limitations. Thus, on this record, the functional limitations opined by Drs. Bacchus and Corcoran (as affirmed by Dr. Bond) are uncontradicted. *See, e.g.*, *Dewey v. Astrue*, No. 10 C 6021, 2013 WL 55832, at *4 (N.D. Ind. Jan. 3, 2013) (affirming the ALJ's decision where it was supported by substantial evidence and uncontradicted medical opinions).

*Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citation omitted)).

Next, Croft argues that the ALJ failed to consider his use of medication in accordance with 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)—specifically, the type, dosage, effectiveness, and side effects of the medications. He states that he told Dr. Kaplansky in September 2013 (one month prior to his surgery) that Norco only takes the edge off of his pain, that many medications do not work for him, that morphine makes him feel "like a zombie," and that Soma makes him "too sleepy." (DE 20 at 11 (citing AR 357)). That is the only evidence, however, that Croft cites in support of his assertion of side effects. Significantly, at the hearing, the ALJ asked Croft about the types, effectiveness, and side effects of his medications. (AR 49). Croft responded that since his back surgery he was taking only Norco and amitriptyline for his back pain and spasms, which were effective and caused *no* side effects other than constipation. (AR 49). "[A]n ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made [his] best case." *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988) (citing *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)). Furthermore, Croft was taking Norco and Soma when he was still working, and apparently Soma did not interfere with his ability to work at that time. (AR 243, 305). Nor did Croft complain of any medication side effects to Dr. Ringel, who was prescribing his medications. (AR 298-308, 417-19). Therefore, on this record, Croft's assertion of reversible error with respect to the ALJ's consideration of his medications is unpersuasive. *See generally Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to

remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).

Croft also contends that the ALJ unfairly discounted the credibility of his symptom testimony based on his lack of treatment. Specifically, Croft points to Social Security Ruling 96-7p, which states that an ALJ may not discount the credibility of the claimant's symptom testimony without considering evidence of record that might explain his lack of treatment. 1996 WL 374186, at *3, 8 (July 2, 1996). Croft emphasizes that he testified at the hearing that his insurance at the time did not cover major procedures like surgery. (AR 59). But the ALJ *did* ask Croft at the hearing why he had put off treatment for his back, and thus, the ALJ was well aware of Croft's insurance concerns. (AR 58-59).

Moreover, the ALJ also considered Croft's daily activities when assessing his credibility—a point that Croft does not challenge. *See Schmidt*, 395 F.3d at 746-47 (stating that an ALJ is entitled to consider a claimant's performance of daily activities as a factor in the credibility assessment); *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ noted that although Croft testified that he spends much of his day in a recliner, he still is able to drive, care for his son, and perform almost all of the household chores, including laundry, vacuuming, cooking, changing bedding, cleaning the bathrooms, and shopping. (AR 25, 55-56). As such, the ALJ adequately considered the various factors set forth in 20 U.S.C. §§ 404.1529(c)(3) and 406.929(c)(3) when assessing the credibility of Croft's symptom testimony.

Ultimately, the ALJ did credit Croft's symptom testimony in significant part. To accommodate his back condition, the ALJ restricted him to light work with additional restrictions on certain postural movements and environmental hazards. (AR 24); *see, e.g.*,

*Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming the ALJ's credibility determination where he discredited the claimant's symptoms only in part). As acknowledged earlier, these limitations are uncontradicted, as no medical source opinion of record assigned Croft any greater limitations. To reiterate, it is the claimant who "bears the burden of supplying adequate records and evidence to prove [his] claim of disability." *Scheck*, 357 F.3d at 702 (citations omitted); *see Bowen v. Yuckert*, 482 U.S. at 146 n.5 ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").

In sum, an ALJ's credibility assessment will stand as long as there is some support in the record. *Berger*, 516 F.3d at 546 (affirming the ALJ's credibility determination because it was not "patently wrong" or "divorced from the facts contained in the record" (citation omitted)). In this instance, the ALJ built an adequate and logical bridge between the evidence of record and her conclusion about the credibility of Croft's symptom testimony, *see Ribaudo*, 458 F.3d at 584, and her conclusion is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination will stand.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Croft.

SO ORDERED.

Entered this 18th day of November 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge